# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| BONNIE RAYSOR, and DIANE SHERRILL, individually and on behalf of others similarly situated, | |
| Plaintiffs, | Civil Action No. _____ |
| v. | [Class Action] |
| LAUREL M. LEE, in her official capacity as Secretary of State, | |
| Defendant. | |

## COMPLAINT

Plaintiff Bonnie Raysor and Plaintiff Diane Sherrill ("Plaintiffs") brings this class action against Laurel M. Lee, in her official capacity as Secretary of State ("Defendant"), and allege the following:

## INTRODUCTION

1.     On November 6, 2018, almost two-thirds of Floridians voted for Amendment 4 to restore the right to vote to individuals with past felony convictions. Except for individuals convicted of murder or felony sexual offense, Amendment 4 re-enfranchised otherwise eligible Florida

citizens automatically "upon completion of all terms of sentence including parole or probation." Fla. Const. art. VI, § 4.

2.     On June 28, 2019, Governor Ron DeSantis signed Senate Bill 7066 ("SB 7066"), which purports to "implement" Amendment 4, in part by seeking to define "all terms of sentence" to include the payment of any restitution, fines, and fees ("legal financial obligations" or "LFOs") ordered by the court "as a part of the sentence *or* that are ordered by the court as a condition of any form of supervision." S.B. 7066, 2019 Leg., Reg. Sess., § 25 (Fla. 2019) (emphasis added).

3.     The natural and foreseeable effect of this "implementing" law will be to drastically reduce the number of people with past convictions who regain the right to vote under Amendment 4; permanently disenfranchise many minor offenders; and dole out the right to vote on the basis of wealth.

4.     On its face, SB 7066 discriminates on the basis of wealth. People with the financial means to satisfy their LFOs either during or at the conclusion of their sentence of incarceration or supervision will have their rights automatically restored. But, people whose socioeconomic status prevents them from satisfying their LFOs concurrent with the

termination of their incarceration or supervision will be prohibited from voting until they are able to pay their outstanding balance.

5.    As a result, whether otherwise eligible individuals will have the right to vote upon completion of their sentence of incarceration and supervision depends entirely on their ability to pay for it. Indeed, two otherwise eligible individuals with the same conviction, who received the same terms of probation and parole, and the same LFOs, would be treated differently under SB 7066 based solely on whether they have the means to satisfy their LFOs.

6.    In short, SB 7066's wealth-based discrimination not only violates the Fourteenth Amendment, but also the Twenty-Fourth Amendment by functioning as a modern-day poll tax.

7.    Further, SB 7066 is vague as to its scope. For example, it is internally contradictory with respect to whether fees or costs incurred after sentencing may nonetheless disenfranchise a person. Although the statute states that individuals must pay all LFOs imposed as a condition of supervision, it also states that individuals must pay only the amount specifically ordered by the court at sentencing. Yet, standard conditions of probation, which are imposed at sentencing, often require individuals

to pay off certain debts that are only incurred *after* sentencing. Thus, SB 7066 will confuse potential voters and chill core First Amendment speech.

8.    Finally, under SB 7066, it will be extraordinarily difficult for individuals with past convictions to determine their eligibility to vote and the risk of erroneous deprivation of the right to vote is high. Persons with both disqualifying and non-disqualifying LFOs will struggle to disaggregate those outstanding debts. And, the updated state voter registration form provided for in SB 7066 fails to inform people with convictions of the new eligibility requirements the law creates.

9.    As a result of SB 7066, people with convictions will often be left in the dark and find themselves in need of a lawyer just to find out their eligibility to vote. Individuals who register in error risk felony prosecution and thus the unique threat of recidivism. Such ambiguity surrounding access to the right to vote violates procedural due process and cannot survive scrutiny under the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

10.    This action is brought under the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

11.    This Court has personal jurisdiction over Defendant Lee, who is an appointed state official and a resident of Florida.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Among other things, the office of Defendant Lee is located in this District.

13.    This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

14.    Plaintiff Bonnie Raysor (née Bonnie Ryan) is fifty-eight years old and has resided in Florida since she was seventeen. She is a United States citizen and currently resides in Boynton Beach, Florida.

15.    After becoming addicted to opioids, Plaintiff Raysor was charged in 2009 and convicted in October 2010 of six felony and two misdemeanor drug-related charges. Since she was unable to afford an attorney, Plaintiff Raysor was assigned a public defender for these charges. She was sentenced to one year, six months, and five days in

prison. Plaintiff Raysor was released from prison on March 29, 2011, with no parole or probation. She has no other criminal convictions.

16.   Plaintiff Raysor works as an office manager and makes thirteen dollars per hour. She has a mortgage and a car payment and is responsible for the utilities, groceries, and other basic needs for herself and her nineteen-year-old daughter, who is a full-time student. She also has approximately $48,000 in student loan debt.

17.   Voting is important to Plaintiff Raysor. As a Floridian, she knows how important a single vote can be in a close election. Voting gives her the opportunity to make a difference, and to speak her mind politically. It gives her the opportunity to make her voice heard.

18.   When Amendment 4 passed, Plaintiff Raysor was thrilled to regain her right to vote. She proactively reached out for help to understand her rights and to ensure that she would be able to register to vote despite her past felony conviction.

19.   Under SB 7066, however, Plaintiff Raysor is unable to register and vote in Florida. She has $4,260 in outstanding fines and fees related to her conviction.

20.   Upon information and belief, this sum includes fines and fees associated with her two misdemeanor and felony convictions. Upon information and belief, when Plaintiff Raysor was convicted, all fines and fees levied upon her were in the form of a civil lien. These fines and fees include the following: court costs, cost of prosecution, crime stoppers fund, cost of investigation, drug trust fund, public defender application fee, and public defender fee.

21.   Based on her current income and ability to pay, Plaintiff Raysor is on a payment plan with the court, where she pays $30 per month towards her outstanding balance. Under this payment plan, Plaintiff Raysor will not pay off her LFOs until 2031. Thus, under SB 7066, she will not regain her right to vote for another twelve years, at which time she will be seventy years old.

22.   Plaintiff Diane Sherrill is fifty-eight years old and is a Florida resident. She is a United States citizen and currently resides in St. Petersburg, Florida.

23.   As a result of her struggle with addiction, Plaintiff Sherrill was convicted of one count of possession of crack cocaine in the third degree, two counts of possession of cocaine in the third degree, and one

7

count of prostitution in the third degree between 1999 and 2005. For each of these charges, Plaintiff Sherrill was determined to be indigent and was assigned a public defender.

24.    Plaintiff Sherrill has been drug-free and sober for over a decade. She has not had any criminal convictions since 2005. She has two adult children who live in the area and one grandchild. She is an active member of her church, Cornerstone Community Church.

25.    Plaintiff Sherrill largely lives on a fixed Supplemental Security Income (SSI) of approximately $770 per month. She lives in public housing and receives approximately $70 per month in Supplemental Nutrition Assistance Program (SNAP) benefits, otherwise known as food stamps. She has recently obtained part-time work at the local Ruby Tuesdays as a hostess, earning $8 per hour for 15 hours per week.

26.    Plaintiff Sherrill lives by herself and is responsible for her monthly rent of $200, her utility bills (including electric, internet, and phone), groceries, car insurance and gas, and any other household expenses.

27.    Plaintiff Sherrill lost her driver's license as a result of her convictions and unpaid LFOs. After ten years, she was recently able to reinstate her driver's license in order to help care for her first grandchild.

28.    Voting is important to Plaintiff Sherrill. As a Floridian, she knows how important a single vote can be in a close election. Voting gives her the opportunity to make a difference, and to speak her mind politically. It gives her the opportunity to make her voice heard.

29.    A few years ago, Plaintiff Sherrill's church set up a table for voter registration of congregants. Plaintiff Sherrill inquired about whether she could regain her voting rights. The organizers referred her to the Pinellas County Supervisor of Elections, Deborah Clark. Plaintiff Sherrill wrote to Supervisor Clark about restoring her voting rights and received an application in the mail in response.

30.    Plaintiff Sherrill wanted to apply to restore her voting rights but could not understand the confusing application she was sent or the process she was supposed to follow.

31.    After the passage of Amendment 4, Plaintiff Sherrill was excited to register to vote and join her political community in voting in

the next election. Since her convictions are well behind her, she believed

she would be eligible to vote under Amendment 4.

32.    Under SB 7066, however, Plaintiff Sherrill will not be eligible

to register to vote and vote in the next election.

33.    Plaintiff Sherrill owes $2,279 in outstanding LFOs related to

her convictions. These LFOs include, *inter alia,* the following: indigent

criminal defense fees, fines, investigative costs, and court costs. Upon

information and relief, these LFOs also include penalties for

nonpayment.

34.    Upon information and belief, all of these outstanding LFOs

were converted to civil liens and sent to a collections agency. Plaintiff

Sherrill is living on a financial razor's edge. She is unable to afford to pay

these LFOs at this time and cannot foresee a time when she will ever be

able to pay these LFOs in full.  As a result, SB 7066 may amount to

permanent disenfranchisement for Plaintiff Sherrill.

35.    Plaintiffs Raysor and Sherrill seek to represent a class for

Count 2 (Twenty-Fourth Amendment) and Count 4 (Procedural Due

Process) defined as: all persons otherwise eligible to register to vote in

Florida who are denied the right to vote pursuant to SB 7066 because they have outstanding LFOs.

36.    Plaintiffs Raysor and Sherrill seek to represent a subclass for Count 1 (Fourteenth Amendment) defined as: all persons otherwise eligible to register to vote in Florida who are denied the right to vote pursuant to SB 7066 because they are unable to pay off their outstanding LFOs due to their socioeconomic status.

37.    Defendant Laurel M. Lee is the Secretary of State of Florida ("the Secretary") and is sued in her official capacity. The Secretary is the head of the Department of State ("the Department") and the chief election officer of the state. As chief election officer, the Secretary is responsible for obtaining and maintaining "uniformity in the interpretation and implementation of the election laws," and providing "uniform standards for the proper and equitable interpretation and implementation" of such laws. Fla. Stat. § 97.012(1)-(2). The Secretary is also responsible for administering the statewide voter registration system. *Id.* § 97.012(11).

38.    Further, under SB 7066, the Department of State is responsible for identifying registered voters who have been convicted of a felony and whose voting rights have not been restored, and for initiating

11

the process for removing potentially ineligible individuals from the voter rolls. *See* S.B. 7066, *supra*, §§ 24, 25, *amending* Fla. Stat. § 98.075(5). The Department is similarly responsible for obtaining and reviewing information on new registrants' eligibility for rights restoration, and for initiating the process for rejecting applications from potentially ineligible voters. *See id.* § 25, *enacting* Fla. Stat. § 98.0751(3)(a).

## FACTS

39.     The Florida Constitution prohibits individuals with felony convictions from voting unless their voting rights have been restored. Fla. Const. art. VI, § 4. As of January 8, 2019, except for persons convicted of murder or felony sexual offense, voting rights are restored automatically "upon completion of all terms of sentence including parole and probation." *Id.* Persons convicted of murder or felony sexual offense are permanently disenfranchised but may apply to the Board of Executive Clemency to have their voting rights restored on a case-by-case basis. *See* S.B. 7066, *supra*, § 25, *enacting* Fla. Stat. § 98.0751(1).

**SB 7066**

40.    On June 28, 2019, Governor DeSantis signed SB 7066 into law. SB 7066 purports to implement the constitutional provision restoring voting rights to individuals with felony convictions, and states:

> A person who has been disqualified from voting based on a felony conviction for an offense other than murder or a felony sexual offense must have such disqualification terminated and his or her voting rights restored pursuant to s. 4, Art. VI of the State Constitution upon the completion of all terms of his or her sentence, including parole or probation.

S.B. 7066, supra,§ 25, *enacting* Fla. Stat. § 98.0751(1).

41.    But SB 7066 does not merely implement Amendment 4. Rather, it severely restricts access to the right to vote. SB 7066 defines "completion of all terms of sentence" to include not only any term of imprisonment, probation, community control or supervision (collectively, "carceral supervision"), but also the full payment of any LFOs, including restitution, fines and fees "ordered by the court as a part of the sentence or that are ordered by the court as a condition of any form of supervision," even if those obligations have been converted to civil liens. *Id.*, *enacting* Fla. Stat. § 98.0751(2).

42.    Governor DeSantis' signing statement accompanying SB 7066 does not address these financial barriers to voting but does state his

personal opinion that Florida voters made a "mistake" by restoring "voting rights to violent felons." By requiring the payment of all LFOs—many of which people with past convictions will never be able to pay—Governor DeSantis has ratified a law that will undermine Amendment 4, which he deems a "mistake."

43.     Florida does not require courts to consider ability to pay at the time LFOs are imposed. When seeking to enforce compliance with a legal financial obligation, however, courts may inquire into ability to pay. *See, e.g.*, Fla. Stat. § 938.30. Based on the individual's ability to pay, a court seeking to enforce a legal financial obligation may order the individual to comply with a payment schedule; convert the obligation to a judgment or civil lien against the individual's property; or may, in limited instances, convert outstanding fines and court costs "into a court-ordered obligation to perform community service." *Id.* Upon information and belief, many mandatory LFOs cannot be converted to community service.

44.     SB 7006 defines the "completion" of LFOs to include: actual payment of the obligation in full; termination of the obligation by the court, with the approval of the payee; or completion of all community service hours where the court has converted the financial obligation to

14

community service. SB 7066, *supra*, § 25, *enacting* Fla. Stat. § 98.0751(5)(e). Finally, SB 7066 states that "[t]he requirement to pay any financial obligation specified in this paragraph is not deemed completed upon conversion to a civil lien." *Id.* This language, however, does not directly address the circumstance of Plaintiff Raysor, whose LFOs were imposed as civil liens as an initial matter.

45.    While SB 7066 acknowledges that LFOs can be modified by the sentencing court, it does not require any modifications to LFOs, even in cases where indigence or inability to pay is the only barrier to voting rights restoration.

**IMPACT OF SB 7066**

46.    Across all jurisdictions in Florida, over $700 million in fines, court costs, and other monetary penalties were assessed in 2018 alone. In addition, over $481 million in fees, service charges, and costs were assessed during 2018. These figures do not include the enormous sum of fines and fees that were assessed prior to 2018 but are still outstanding.

47.    Criminal Circuit Courts in Florida assessed over $275 million in fines and fees during 2018. Of that amount, nearly thirty percent is categorized as at risk for collection due to indigence or reduction to a civil

15

judgment or lien. In several Circuits, the amount at risk due to indigence is over forty percent. Criminal Circuit Courts in Florida converted only about $1.2 million in court fines to community service during 2018.

48.   The Department of Corrections reported just under $20 million dollars in revenue from cost of supervision fees in fiscal year 2017-2018, nearly $50 million dollars in revenue from restitution, fines, and court costs, and over $20 million dollars in court ordered fees.[1]

49.   Individuals with past felony convictions are more likely to have lower incomes than other registered voters, and to live in neighborhoods with higher unemployment than other Florida voters.[2]

50.   On information and belief, many individuals with fines, fees, and restitution ordered as part of their sentence or as a condition of supervision related to a felony conviction also have other LFOs assessed through the criminal justice system. These may include LFOs associated with felony convictions but not ordered at the time of sentence or as a condition of supervision. In other instances, LFOs may be related to

---

[1]   Fla.   Dep't   of   Corr.,   *2017-2018   Annual   Report*   6, http://www.dc.state.fl.us/pub/annual/1718/FDC_AR2017-18.pdf.

[2]   *See* Kevin Morris, *Thwarting Amendment 4*, Brennan Ctr. for Justice, https://www.brennancenter.org/sites/default/files/analysis/2019_05_FloridaAmendment_FINAL-3.pdf.

misdemeanor or civil judgments, rather than a felony conviction. On information and belief, these LFOs are not disaggregated by the County or the court when converted to a civil judgment, lien, community service, or incorporated into a payment plan.

51.    For example, upon information and belief, Plaintiff Raysor has fines and fees associated with her misdemeanor convictions, which are a part of the $4,260 she still owes. Based on the records available to Plaintiff Raysor, she cannot ascertain how much of her $30 monthly payments go towards her felony versus misdemeanor LFOs. Nor does she know if she may prioritize paying the LFOs associated with her felony convictions, which prevent her from voting.

52.    Similarly, Plaintiff Raysor does not know how the outstanding LFOs associated with her felony convictions break down, such that she cannot determine which of these LFOs fall within the scope of SB 7066, and which fall outside the scope of SB 7066. Nor does she know whether the fact that her LFOs were initially imposed as a civil lien—rather than converted—affects their status under SB 7066.

53.    Likewise, Plaintiff Sherrill believes that some of her outstanding LFOs are penalties for nonpayment that should not bar her

from voting under SB 7066. But since the full balance has been sent to a collections agency, she does not know if or how she may prioritize paying the LFOs that disqualify her from voting.

54.   Plaintiff Sherrill does not know if there are additional fines, fees, and costs within her outstanding balance that fall outside the scope of SB 7066.

55.   For individuals whose LFOs have been converted to community service, a civil judgment, or lien, satisfaction of the obligation is often determined by a private third-party. Private non-profit, community, or charitable organizations may all serve as community service agencies for the purpose of court-ordered community service. *See* Fla. Stat. § 318.18. The responsibility for monitoring and recording community service hours—defined as "uncompensated labor for a community service agency"—falls to these entities. *Id.* Similarly, a county may pursue the collection of outstanding LFOs through private attorneys and collection agencies. Not only does this place the obligation in the hands of a third party, but Florida allows those parties to impose a surcharge of up to forty percent of the balance owed as a collection fee.

56.    For example, at times when she was facing financial hardship, Plaintiff Raysor has fallen behind on paying her LFOs. As a result, in 2014, her debts were placed with a collection agency, Penn Credit, which imposed a forty percent surcharge on her balance. Plaintiff Raysor also lost her driver's license as a consequence of her overdue LFOs. Ultimately, she was able to petition the court to remove the surcharge, place her back on a payment plan, and reinstate her driver's license. She currently pays $30 per month toward her LFO balance.

57.    Upon information and belief, Plaintiff Sherrill's outstanding balance includes several substantial fees imposed  as penalties for transfer to a collections agency.

58.    Fines and fees that may be assessed as part of an individual's sentence include, but are not limited to: mandatory assessments for the Court Cost Clearing Trust Fund, the Crimes Compensation Trust Fund, the Operating Trust Fund of the Department of Law Enforcement, a mandatory $225 fine for a felony conviction, mandatory fines assessed based on the specific felony conviction or convictions, mandatory costs authorized by local governmental entities, discretionary costs related to

the specific type of case or conviction, and additional surcharges on these costs. *See generally* ch. 983, Fla. Stat.

59.   In addition, conditions of carceral supervision imposed at sentencing may include, but are not limited to: payment of debts due to a detention center for medical care, treatment, hospitalization, or transportation; application fees and attorneys' costs and fees if the individual had a public defender appointed; and reimbursement for costs of drawing and transmitting blood or DNA samples to the Department of Law Enforcement. *See, e.g.*, Fla. Stat. § 948.03.

60.   In other words, under SB 7066, it appears an individual's right to vote may be conditioned on the payment of outstanding medical debt that accrues after sentencing.

61.   Thus, the requirement in SB 7066 that an individual pay off all LFOs "ordered by the court as a condition of any form of supervision," SB 7066, § 25, *enacting* Fla. Stat. § 98.0751(2)(a)(5)(b), is inconsistent with later language stating that payment of LFOs "accrue[d] after the date the obligation is ordered as a part of the sentence" is *not* required to be eligible for rights restoration, *id.*, *enacting* Fla. Stat. § 98.0751(2)(a)(5)(c). This internally incoherent language will undoubtedly

leave Florida citizens in the dark about which LFOs are disqualifying and which LFOs are not disqualifying.

62.    Upon information and belief, this confusion will only be compounded by the lack of easy access to records disaggregating the LFOs incurred by a person with a past conviction. Plaintiffs Raysor and Sherrill, even with assistance of counsel, have been unable to ascertain this information with respect to their own outstanding debts.

63.    SB 7066 itself recognizes that Florida citizens are not likely to be able to assess their own eligibility to vote under this law. It provides for the creation of a "Restoration of Voting Rights Work Group." SB 7066, §33. The work group is charged with developing recommendations for the Legislature related to "[t]he process of informing a registered voter of the entity or entities that are custodians of the relevant data necessary for verifying . . . eligibility for restoration of voting rights." *Id.*

64.    Yet, SB 7066 becomes effective on July 1, 2019, and these recommendations are not due to the Legislature for consideration until November 1, 2019. *Id.* In other words, the Legislature passed SB 7066 fully aware that eligible Florida citizens will struggle or be unable to ascertain their eligibility to vote.

65.    Nonetheless, after July 1, 2019, Florida citizens will risk criminal sanction if they register to vote while their voting rights have not, in fact, been restored under SB 7066's vague and ambiguous language. This is so despite the fact that the updated state voter registration form required by SB 7066 will not mention the LFO requirement at all.

66.    The mechanics of SB 7066 are inordinately complicated for affected citizens, and its scope is vague. Its consequences, however, are clear. Under SB 7066, Floridians with past felony convictions who have completed their term of carceral supervision, including incarceration, probation, and parole, and who either do not have LFOs or have paid them off, will automatically have their voting rights restored. Individuals who have outstanding LFOs are denied the right to vote unless or until they are able to satisfy their financial obligations. An individual who is unable to pay off her outstanding LFOs due to her socioeconomic status is permanently denied the right to vote.

67.    In short, SB 7066 conditions the restoration of voting rights entirely upon an individual's financial resources, in violation of the Fourteenth and Twenty-Fourth Amendments.

**EXECUTIVE CLEMENCY**

68.    Under SB 7066, individuals who are disenfranchised solely because of their outstanding LFOs may apply for executive clemency, subject to the "unfettered discretion" of the Florida Governor. *See* SB 7066, § 25, *enacting* Fla. Stat. § 98.0751(1); Fla. R. Exec. Clemency 4. This "unfettered discretion" means the Governor has the authority "to deny clemency at any time, for any reason." Fla. R. Exec. Clemency 4.

69.    Thus, individuals able to pay their LFOs can register and vote automatically upon completing carceral supervision, while those unable to pay are disenfranchised indefinitely, subject to the whim of the Governor.

70.    Applying for executive clemency is extremely burdensome. An individual with outstanding LFOs must wait seven years after the completion of carceral supervision to apply for a restoration of civil rights.[3] Fla. R. Exec. Clemency 5. If denied, an applicant must wait for at least two years to reapply. Fla. R. Exec. Clemency 14. Applications must contain certified copies of the charging document, judgment, and

---

[3] Individuals with no outstanding restitution may be eligible to apply for rights restoration after five years, depending on their crime of conviction. *See* Fla. R. Exec. Clemency 9.

sentence for each felony conviction. Fla. R. Exec. Clemency 6(B). After applying, the individual is subject to an investigation by the Florida Commission on Offender Review, and her application will be decided at a hearing in Tallahassee.[4] Fla. R. Exec. Clemency 8(B). The applicant must give ten days notice to the Board if she or any other person intends to speak at the hearing on her behalf. Fla. R. Exec. Clemency 12(B). The final determination of any application is subject to the "unfettered discretion" of the Florida Governor. Fla. R. Exec. Clemency 4.

71.     Thus, even after completing the burdensome application process, individuals who lack the means to pay their LFOs will not be allowed to vote "unless Florida's Governor approves restoration of this fundamental right" or a complete remission of their LFOs. *Hand v. Scott*, 285 F. Supp. 3d 1289, 1292 (N.D. Fla. 2018). Meanwhile, similarly

---

[4] Prior to January 8, 2019, all Floridians with past felony convictions were permanently disenfranchised unless they applied for and obtained a restoration of civil rights from the Governor and the Board of Clemency. Under this system, individuals who had paid their restitution were eligible to apply for rights restoration without being subject to a hearing. In *Johnson v. Governor of Fla.*, the Eleventh Circuit found the hearing requirement, standing alone, insufficient to support a claim that restoration was conditioned upon an applicant's financial resources. 405 F.3d 1214, 1216 n.1 (11th Cir. 2005). The Court reserved ruling, however, on the question of "whether conditioning an application for clemency on paying restitution would be an invalid poll tax." *Id.* Plaintiffs' claims present exactly the question reserved by the Court. But for their outstanding LFOs, Plaintiffs' voting rights would be restored. But for their outstanding LFOs, Plaintiffs would not be subject to a discretionary restoration process at all. The entire clemency procedure is conditioned upon otherwise eligible individuals' inability to pay.

situated individuals—including those convicted of the same crimes—are granted automatic restoration of their voting rights based solely on their ability to pay their LFOs.

72.    This process necessarily discriminates on the basis of wealth. Rights restoration is guaranteed to individuals of financial means, while the indigent must not only suffer the indignity of having to beg for their rights to be restored, but they must do so on blind faith, without any notice of the conditions, factors, or whims that will determine if their application is successful.

## CLASS ALLEGATIONS

73.    Upon information and belief, at least 500,000 individuals with past felony convictions who are otherwise eligible under Amendment 4 have outstanding LFOs and are therefore not qualified for voting rights restoration under SB 7066, just like Plaintiffs. Countless otherwise eligible individuals will be prevented from exercising their right to vote in the future because they are unable to pay their LFOs due to their socioeconomic status.

74.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Raysor and Sherrill bring this action on behalf of themselves and all

other similarly situated persons. Plaintiffs Raysor and Sherrill do not seek claims for compensatory relief. Instead, Plaintiffs seek only declaratory and injunctive relief broadly applicable to members of the Plaintiff Class and the Plaintiff Subclass, as defined above. The requirements of Rule 23, and in particular Rule 23(b)(2), are met with respect to the Plaintiff Class and Plaintiff Subclass as defined in ¶¶ 22 and 23.

75.     The members of the Plaintiff Class and Plaintiff Subclass are so numerous that joinder is impracticable. While the exact number of members in the Plaintiff Class and Plaintiff Subclass are not publicly available, upon information and belief, the total number of otherwise eligible citizens of Florida disenfranchised due to some combination of outstanding fines, fees, or restitution exceeds 500,000. The Plaintiff Class and Plaintiff Subclass are ascertainable through Defendant's records and records kept by the Florida State Department of Corrections. Indeed, under SB 7066, it is Defendant's responsibility to identify registrants who are not eligible for rights restoration because they have outstanding LFOs.

76.   Common questions of law and fact predominate over questions affecting only individual class and subclass members with respect to allegations in this complaint. Those questions include, but are not limited to, the following:

      a.   Whether SB 7066 discriminates on the basis of wealth in violation of the Fourteenth Amendment.

      b.   Whether SB 7066 violates the Twenty-Fourth Amendment.

      c.   Whether SB 7066 creates an impermissible risk of erroneous deprivation of the fundamental right to vote in violation of the Due Process Clause of the Fourteenth Amendment.

77.   Plaintiffs' claims are typical of the Plaintiff Class and Plaintiff Subclass as defined in ¶¶ 22 and 23. Plaintiffs Raysor and Sherrill are not aware of any conflict between their interests and those of the Plaintiff Class and Plaintiff Subclass they seek to represent.

78.   Plaintiffs Raysor and Sherrill can fairly and adequately represent the interests of the Plaintiff Class and Plaintiff Subclass because they are similarly situated with class members. Plaintiffs Raysor and Sherrill have retained counsel experienced in class-action and voting

rights litigation to represent them and the Plaintiff Class and Plaintiff Subclass for the purpose of this litigation.

79.    Defendants have acted, or refused to act, on grounds generally applicable to the entire class, and final injunctive relief and corresponding declaratory relief are appropriate respecting the class as a whole.

## CLAIMS
### Count 1: Wealth-Based Disenfranchisement, Fourteenth Amendment

80.    Plaintiffs reallege the facts set forth in paragraphs 1-79 above.

81.    A state "violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966); *see also Johnson v. Governor of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).

82.    By requiring an otherwise eligible Florida citizen to pay all LFOs before she is eligible to restore her right to vote, SB 7066 impermissibly makes financial payments an electoral standard.

83.   By requiring an otherwise eligible Florida citizen to pay all LFOs before she is eligible to restore her right to vote, SB 7066 impermissibly makes the affluence of an otherwise eligible voter an electoral standard.

84.   It is well established that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).

85.   Wealth "is not germane to one's ability to participate intelligently in the electoral process." *Harper*, 383 U.S. at 668.

86.   Plaintiffs Raysor and Sherrill and members of the Plaintiff Subclass are unable to afford to pay their remaining LFOs, and this is the only reason they are not eligible to vote in the state of Florida.

87.   The mere possibility that LFOs could, in some cases, be modified—left to the discretion of individual judges—does nothing to alleviate this unconstitutional barrier to voting for Plaintiffs Raysor and Sherrill and other members of the Plaintiff Subclass. Nor does the possibility that the Governor could, if he felt so moved, exercise his discretion to restore the right to vote to individuals with outstanding LFOs on a case-by-case basis. Indeed, Representative James Grant noted

in enacting SB 7066 that discretionary rights restoration is "'a recipe for rampant discrimination.'"[5] Moreover, it is well established that imposing additional requirements on voters who cannot pay is no more constitutionally permissible than outright disenfranchisement. *See Harman v. Forssenius,* 380 U.S. 528 (1965).

88.    It is also well established that a state may not impose additional punishment[6] or deprive a citizen of a fundamental right solely because "through no fault of his own, he cannot pay the fine." *Bearden v. Georgia,* 461 U.S. 660, 673 (1983). In other words, *Bearden* requires a careful consideration of ability to pay before fundamental rights are withheld on the basis of failure to pay a fine. Failure to condition the LFOs requirement on an ability to pay inquiry further violates "the fundamental fairness required by the Fourteenth Amendment." *Id.*

---

[5] Tyler Kendall, *Felons in Florida Won Back Their Right to Vote. Now a New Bill Might Limit Who Can Cast a Ballot*, CBS News (May 23, 2019), https://www.cbsnews.com/news/florida-felons-won-back-right-to-vote-new-bill-might-limit-who-can-cast-ballot-2019-05-23/.

[6] While not a necessary element of Plaintiffs' claims, disenfranchisement on the basis of a past conviction—and continued because of inability to pay LFOs—certainly qualifies as punishment. *See Johnson,* 405 F.3d at 1228 ("Indeed, throughout history, criminal disenfranchisement provisions have existed as a punitive device."); *see also* Act of June 25, 1868, ch. 70, 15 Stat. 73, 73 (Readmission Act for Florida) (prohibiting any change to the state constitution that "deprive[s] any citizen or class of citizens of the United States of the right to vote . . . except as punishment for such crimes as are now felonies at common law").

89.    Florida has no cognizable interest in withholding the right to vote from citizens solely on the basis that they are unable to pay their LFOs. "[W]ealth or fee paying has . . . no relation to voting qualifications." *Harper*, 383 U.S. at 670. When the LFOs requirement is applied to those unable to pay, "the statute merely prevents" citizens from voting "without delivering any money at all into the hands of [the State]." *Zablocki v. Redhail*, 434 U.S. 374, 389 (1978); *see also Bearden*, 461 U.S. at 670 ("Revoking the probation of someone who through no fault of his own is unable to make restitution will not make restitution suddenly forthcoming.").

90.    SB 7066 invidiously discriminates between Florida citizens with prior felony convictions who have been discharged from carceral supervision and who are able to pay their LFOs, and Florida citizens with prior felony convictions, who have been discharged from carceral supervision but are unable to pay their LFOs, in violation of the Fourteenth Amendment.

## Count 2: Poll Tax, Twenty-Fourth Amendment

91.    Plaintiffs reallege the facts set forth in paragraphs 1-90 above.

31

92.    The Twenty-Fourth Amendment provides that "[t]he right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay *any poll tax or other tax*." U.S. Const. amend. XXIV, § 1 (emphasis added).

93.    For those who are otherwise eligible SB 7066 denies the right to vote to those who cannot afford to pay their LFOs solely by reason of their failure to pay fines and fees to the State of Florida.

94.    SB 7066 hinges access to the right to vote on the payment of many fines and fees to the government—such as contributions to various state funds and to the costs of the court system itself—that fall well within any reasonable definition of "other tax." *See U.S. v. State Tax Comm'n of Miss.*, 421 U.S. 599, 606 (1975) (noting that the "standard definition of a tax" is any "enforced contribution to provide for the support of government").

95.    The failure to call SB 7066's LFOs requirement a "poll tax" does nothing to change its function, which hinges access to the ballot box on the payment of a variety of fines and fees to the state of Florida. *See*

32

*Harman*, 380 U.S. at 540-41 ("[T]he Twenty-fourth [Amendment] nullifies sophisticated as well as simple-minded modes of impairing the right guaranteed." (internal quotation marks omitted)).

96.  SB 7066 directly conflicts with the prohibition of the Twenty-Fourth Amendment.

**Count 3: Void for Vagueness, First and Fourteenth Amendment**

97.  Plaintiffs reallege the facts set forth in paragraphs 1-96, above.

98.  The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires that a law that imposes penalties give ordinary people reasonable notice of what conduct it prohibits and guard against arbitrary and discriminatory enforcement.

99.  The applicability of the void for vagueness doctrine is heightened both when criminal sanctions are attached to a vague law and when the First Amendment is implicated.

100. Here, SB 7066 does both. It attaches threat of criminal sanction to the acts of registering to vote and voting, both of which fall squarely within "core political speech" given the utmost First Amendment protection.

101. SB 7066 does not reasonably inform people with past convictions of which LFOs—imposed as a condition of supervision or imposed in the first instance as civil liens—are disqualifying and which are not. Nor does it, by its own admission, provide citizens with access to the records necessary to determine their eligibility. The reasonable person, like Plaintiffs Raysor and Sherrill, with a variety of outstanding LFOs will not be able to determine which LFOs are disqualifying and which are not.

102. The state voter registration form—as updated by SB 7066—will not provide citizens with meaningful information to determine their eligibility to vote.

103. Nonetheless, the state subjects voters who make an error in determining their eligibility to the threat of criminal prosecution.

104. This cocktail of confusion and obfuscation will undeniably chill the registration and voting of eligible Florida voters in violation of the First and Fourteenth Amendments. The ambiguous portions of the LFOs requirement—as they relate to LFOs imposed as conditions of supervision or as civil liens in the first instance—must be enjoined.

**Count 4: Violation of Due Process, Fourteenth Amendment**

105.  Plaintiffs reallege the facts set forth in paragraphs 1-104, above.

106.  A "claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).

107.  Plaintiffs Raysor and Sherrill and the members of the Plaintiff Class and Subclass have a constitutionally protected right to vote upon completion of their sentence per Art. VI § 4 of the Florida Constitution and the Fourteenth Amendment to the U.S. Constitution.

108.  SB 7066 denies otherwise eligible individuals the right to vote unless and until they pay off certain—but not all—legal financial obligations.

109.  Further, SB 7066 fails to provide for adequate procedures to ensure that individuals who qualify for rights restoration are able to register and vote in Florida.

110. Determining what process is due under the Fourteenth Amendment "is a flexible concept that varies with the particular circumstances of each case." *Id.* Under *Mathews v. Eldridge*, the determination of what process is due rests on the balance between (1) the interest affected; (2) the risk of erroneous deprivation under the current procedures and the "probable value, if any, of additional or substitute procedural safeguards;" and (3) the state's interest, including the "fiscal and administrative burdens" additional procedures would entail. 424 U.S. 319, 335 (1976).

111. Here, the constitutionally protected interest at stake is no less than the fundamental right to vote, and the risk of erroneous deprivation is high. SB 7066 conditions the restoration of voting rights on payment of unenumerated legal financial obligations, without providing for any process by which an otherwise eligible voter can (1) differentiate between LFOs that are disqualifying and those which are non-disqualifying, or (2) prioritize payment of disqualifying LFOs, such that they are not disenfranchised by their inability to pay off non-disqualifying LFOs.

112. The Florida criminal justice system imposes a dizzying array of fines, fees, and costs on persons with felony convictions, including

processing fees, surcharges, penalties, and costs that are incurred after sentencing, but which must be paid off as a condition of supervision. Not only is SB 7066 itself internally inconsistent about which LFOs disqualifying, it fails to provide any procedures for otherwise eligible individuals to determine which of their LFOs are disqualifying, or to prioritize payment of those LFOs that prevent them from being able to vote.

113. In other words, even those individuals able to pay their disqualifying LFOs may be denied the right to vote because they are unable to determine which LFOs are disqualifying, or because they are not allowed to pay fully their disqualifying LFOs without also paying toward their non-disqualifying LFOs.

114. Further, SB 7066 fails to provide any procedures for how Defendant Lee shall identify registered voters or new registrants whose rights have not been restored due to disqualifying LFOs, including on what basis Defendant Lee shall determine that information related to an individual's disqualifying LFOs is "credible and reliable." S.B. 7066, 2019 Leg., Reg. Sess., § 24 (Fla. 2019).

115.  In creating the Restoration of Voting Rights Work Group, SB 7066 acknowledges that Defendant Lee does not yet know what data is necessary to determine an individuals' eligibility to vote under SB 7066, and that no process yet exists for informing registered voters where they may find this information. Indeed, the Work Group's report and recommendations for developing these data sources and procedures are not due until four months after the effective date for SB 7066. And the law makes no provision for when or if these recommendations, or any other such procedures, shall be adopted.

116. The lack of procedural safeguards creates a substantial likelihood that eligible voters will be denied the right to vote upon completion of their sentence based on outstanding but non-disqualifying LFOs.

117.  In other words, SB 7066 creates a substantial likelihood that individuals entitled to rights restoration under the Florida Constitution will be erroneously deprived of their right to vote.

118. As stated above, the state has no cognizable interest in discriminating against otherwise eligible voters on the basis of wealth. Nor does the state have any interest in using the right to vote as an

incentive for individuals to pay their LFOs. And even to the extent the state has an interest in ensuring that persons with past felony convictions pay in full their financial obligations associated with their convictions, there is simply no evidence to suggest that withholding voting rights until payment of LFOs is complete assists the state in achieving that end any more so than existing procedures unrelated to voting. Indeed, the fiscal and administrative burdens on the state of ensuring that eligible voters are not denied the right to vote under SB 7066 are substantially higher than they otherwise would be, absent the LFO requirements.

119. SB 7066 therefore violates due process because it creates a procedure for restoration of voting rights that is fundamentally unfair and gives rise to a substantial likelihood of erroneous deprivation of the right to vote, and which cannot be justified by any cognizable state interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

(1) Certify the Plaintiff Class as defined in paragraph 22, and the Plaintiff Subclass as defined in paragraph 23;

(2) Issue a declaratory judgment that SB 7066, by its terms and as applied, violates the Fourteenth and Twenty-Fourth Amendments of the U.S. Constitution;

(3) Issue a declaratory judgment that the identified LFOs portions of SB 7066, by their terms and as applied, are void for vagueness in violation of the First and Fourteenth Amendments;

(4) Issue a declaratory judgment that SB 7066 fails to provide adequate safeguards against unlawful disenfranchisement in violation of the Fourteenth Amendment;

(5) Enjoin Defendant, her agents, employees, successors, and all those persons acting in concert or participation with them, from enforcing SB 7066 including:

    a. Enjoining Defendant from initiating a process for the rejection of any voter registration applications on the basis of outstanding LFOs;

    b. Enjoining Defendant from initiating a process for the removal of any voters from the voter registration rolls on the basis of outstanding LFOs;

c. Requiring Defendant to instruct county election supervisors that outstanding LFOs do not disqualify any individual from voting rights restoration, and therefore not to remove or reject any registrant based on outstanding LFOs;

d. Requiring Defendant to inform those with past felony convictions that the failure to pay LFOs does not disqualify them from voting rights restoration under Amendment 4;

e. Requiring Defendant to instruct county election supervisors to restore Florida citizens to the voter registration rolls if they were removed solely on the basis of their outstanding LFOs;

(6) Award Plaintiffs their costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Civil Rights Attorney's Fees Awards Act of 1973, 42 U.S.C. § 1988(b); and

(7) Grant such other equitable and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Chad W. Dunn
    *Counsel for Plaintiff*

Chad W. Dunn
Florida Bar No. 0119137
1200 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 783-2190
Facsimile: (305) 783-2268
chad@brazilanddunn.com

Danielle Lang (DC Bar No. 1500218)*
Mark P. Gaber (DC Bar No. 988077)*
Molly E. Danahy (DC Bar No. 1643411)*
Blair Bowie (DC Bar No. 252776)*
Jonathan Diaz (DC Bar No. 1613558)*
1101 14th Street NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
dlang@campaignlegal.org
mgaber@campaignlegal.org
mdanahy@campaignlegal.org
bbowie@campaignlegal.org
jdiaz@campaignlegal.org

*\*pro hac vice* motion forthcoming